KNOWLES *v.* SMITH.

1. TROVER AND CONVERSION—DEMAND—SALE OF PROPERTY.

Where plaintiff stored a quantity of machinery in the building of a corporation, of which one of the defendants was treasurer, paying an agreed amount for storage, and a fire occurred that damaged the machinery and some property of the corporation, and, on learning of it, plaintiff went to the building to get his machinery, but found the premises in charge of a watchman who refused to let him remove the property, afterwards writing the official in charge, but receiving no response, and the defendant sold all the personal property that was later removed, there was no necessity of a demand before suit, and, hence, a letter which plaintiff wrote to the defendant in relation to getting back his machinery was not essential to plaintiff's case. *Held*, also, that the action of the aforesaid defendant who participated in the sale could not be treated as merely in a clerical capacity.

2. SAME—AGENCY—LIABILITY.

An agent, as well as his principal, may be held liable for conversion.

3. SAME—EVIDENCE.

And an agent who tried to determine whether · or not plaintiff owned the machinery, as he claimed to do, decid-

ing that the claim was unfounded, and disposing of the machinery for his principal, was chargeable in trover.

Error to Calhoun; North, J. Submitted January 6, 1916. (Docket No. 43.) Decided March 30, 1916.

Trover by Elmer F. Knowles against William J. Smith and others for the conversion of certain machinery. Judgment for defendants, on a directed verdict. Plaintiff brings error. Reversed.

*R. G. Leitch*, for appellant.

*Albert C. Kingman* and *Joseph L. Hooper*, for appellee.

This is an action in trover brought for the conversion of certain machinery. The record discloses the following material facts:

Prior to the year 1911 the Norka Food Company, Limited, was in business in Battle Creek. It appears that it went out of business in that year owning a factory, and certain machinery and equipment located therein. The defendant William J. Smith was treasurer of the company. One C. C. Beach was also interested in the company. It seems that Beach held a mortgage upon the property of the company and secured the title to the machinery in question under foreclosure. Some time after the mortgage foreclosure, and probably in the year 1911, the plaintiff purchased a considerable amount of the machinery located in the building from Mr. Beach through a Mr. Griswold, Mr. Beach's son-in-law. Plaintiff testifies that there were 10 separate sales, aggregating $405. Having no customer for the machinery at the time, plaintiff testified that he entered into an agreement with Mr. Griswold to the effect that the machinery might remain in the building until the building was sold or rented, and upon the happening of either of said events plaintiff

was to have sufficient notice so that he might remove his property. Later plaintiff entered into a further agreement with Mr. Griswold by the terms of which he was permitted to store in said building certain other machinery, paying for said privilege the sum of $1 per month. A short time after plaintiff had stored his machinery in the building the Common-wealth Power Company rented the building and stored therein several carloads of Portland cement, piling it on the machinery in such manner as to make it impossible to remove it. After the cement was placed in the building a fire occurred, damaging the building to some extent, and plaintiff's machinery in a lesser degree. After the fire the plaintiff went to the building with the intention of taking his machinery therefrom, but found the building in charge of a watchman and was refused permission to take his property. He thereupon went to Mr. Beach, who referred him to Mr. Griswold. Plaintiff testifies that he endeavored to see Mr. Griswold and wrote him, but was never able to secure any answer to his letters, or obtain an interview with Mr. Griswold. No notice was ever served upon plaintiff to take his property from the building, where it remained until the fall of 1913. The record discloses that on the 29th day of October, 1913, defendant Smith, acting as agent for Beach, sold to one Silas Miller certain of the personal property located in the building. The sale was evidenced by the following memorandum:

"BATTLE CREEK, MICHIGAN, October 28, 1913.
"I hereby agree to purchase from the Norka Food Co., Ltd., all the salvage belonging to said company as result of their fire one year ago and to remove same from the premises.
"In consideration of the above, I am to pay the Norka Food Co., one thousand dollars ($1,000.00), as follows: Three hundred (300) dollars to be deposited to this account on November 6; two hundred (200)

dollars on December 1; five hundred (500) dollars on or before January 7.

"On paying the three hundred dollars ($300) I am to have the privilege of removing the brick from the premises, but I hereby hold myself bounden and obliged to the Norka Food Co. not to remove any other material of any name or nature from the premises until the entire amount of one thousand ($1,000.00) dollars has been paid in full.

"I hereby agree to leave the premises free and clear of all debris and rubbish of every name and nature, and will remove the building entire to the foundation wall. This is to be left intact ready for the construction of a new building, and all brick and other debris now in the cellar is to be removed so that the premises will present a clean appearance.

"Signed and sealed this 29th day of October, A. D. 1913.

[Signed]   "SILAS A. MILLER. [L. S.]"

Plaintiff, learning that Miller claimed to be the owner of the property in the building which he had bought, and desiring to buy an oven which had not been included in his former purchase, went to see Mr. Smith in reference thereto. Plaintiff testified:

"I went to see Mr. W. J. Smith about the oven. I wanted to see if it was satisfactory to make payment for the oven to Si Miller. Mr. Smith told me that whatever terms I made with Mr. Miller would be satisfactory, but the payments should be made to him there at the bank, and he would give Mr. Miller credit for it. Mr. Smith told me that he had sold this property to Mr. Miller. He made no reservation of any property that was left out in his sale to Miller. Mr. Smith said he had sold everything to him; that is, everything that was in the factory. He stated that Mr. Nichols and Mr. Bush and himself and Mr. Beach owned it, but that he was the agent of it, or to that effect. I paid Mr. Smith for machines purchased from Mr. Miller by check made payable to the Norka Food Company. The check was indorsed by 'Silas Miller' and 'Norka Food Company, by W. J. Smith, Treas.' I didn't at that time tell Mr. Smith that I had some property in

the Norka Food building. As soon as I asked Mr. Smith about that oven, he turned and went off somewhere else. He was in a hurry, and as to my dealings, as I have good authority for dealing with Mr. Griswold, I did not know as it would help me any to get it all complicated. I saw Mr. Smith about my property a short time after that; it might have been four or six weeks. Mr. Miller and I were both present at this conversation about the machinery. Mr. Miller claimed at that time that Mr. Smith had sold it to him. Mr. Smith did not deny it. The conversation was an endeavor to clean the matter up between the three of us amiably. I made no settlement of the matter then. I received no pay for any portion of it. I have lost my property by reason of the sale to Mr. Miller by Mr. Smith and these gentlemen. The property has been moved from the Norka building. I wrote to Mr. Smith concerning my interest in that property. I never got any reply to that letter. That is the letter which I wrote to Mr. Smith concerning my property there."

Subsequently Miller sold portions of this property to one Natchez under a written contract as follows:

"BATTLE CREEK, MICH., March 4, 1914.
"Mr. Shay Natchez agrees to buy all iron of the Norka building, steel, cast iron and wrought iron, also to take the engine where it stands, and get it out himself. All other iron is to be put out of the building in yard. Miller to reserve as many straight eye beams as he likes and six iron posts and some piping at eight dollars per 2,000 lbs.—$100.00 to be paid down, and balance to be paid as iron is taken away.

"SHAY NATCHEZ.
"SILAS A. MILLER."

And a further portion under a second written contract as follows:

"BATTLE CREEK, MICH., April 7, 1914.
"This agreement made between Shay Natchez and Silas A. Miller. This agreement is to take the place of an agreement made March 4, 1914, for iron at the Norka plant. Shay Natchez is to pay six hundred dollars ($600.00) for the iron at the Norka plant,

Silas A. Miller to reserve the oven and all fixtures pertaining to oven, the boiler and all fixtures belonging to it and water heater, also all soil pipe and water pipe and galvanized pipe, the balance of the junk to go to Shay Natchez. ($300.00) Three hundred dollars check to be given today which is guaranteed to be good, and ($300.00) three hundred dollars to be paid from the cast iron which is to be shipped to Nichols & Shepard Co. and an order given on them to pay Silas A. Miller ($300.00) three hundred dollars. No iron to be removed except as above till ($600.00) is paid in full.

"SHAY NATCHEZ.
"SILAS A. MILLER."

It appears to be undisputed that the property purchased from Miller by Natchez included at least a portion of the machinery which had been sold by Griswold to plaintiff, and it is undisputed that the money paid by Natchez to Miller was immediately turned over by Miller to Smith, and by Smith credited to the account of the Norka Food Company, Limited, in the Old National Bank of Battle Creek, of which Smith is vice president. Mr. Smith on cross-examination admitted that plaintiff made a claim of ownership of the property which he (Smith) under the direction of Beach had sold to Miller. He testified:

"I told Mr. Knowles I would investigate the matter with Mr. Beach. I saw Mr. Beach, and said: 'A gentleman named Knowles was introduced to me the other day, and he says that he has $50 worth of stuff there, and that either the Norka Food Company or Mr. Miller should pay him $50.' He said: 'I will have to take it up with Fred.' So I took it up with him and asked him about it a few days later when he came into the bank.

"Q. That is Mr. Griswold?

"A. Yes. He said: 'I have asked Fred about that, and Fred says he don't remember that stuff or whether he took it away at the time he bought it, and at the time of the fire he could not have had at any rate more than $150 worth of stuff, and that was left there at his own risk subject to everything that went on.' I

gave the matter no further attention, because Mr. Beach was a man of truth and veracity in this community, and I paid no more attention to it.

"*Q.* Remember telling me that the reason you would do nothing about this matter was that you had nothing but Mr. Knowles' bare word for the fact that he owned anything?

"*A.* That is all I did have, but I don't remember telling you that, but I remember telling Mr. Knowles that at the time he asked for the $50.

"*Q.* Would you say that that was a sufficient answer to a man whose property you had sold?

"*A.* I had no knowledge of anything belonging to Mr. Knowles.

"*Q.* But if you had sold it?

"*A.* If I had I should have answered him differently. I did not say that directly to Mr. Knowles. I know various people have purchased things up there, and, so far as my having proof of the things, I would not know any more about it than if half a dozen people came up there and said they had purchased something and left it there. I said: 'That is no disrespect to you, but you have no proof of it any more than any one else who would have the same claim.'

"*Q.* Did you know at the time that you accepted the check for $300 that Mr. Knowles was claiming some machinery out of the Norka building?

"*A.* I knew nothing more than what Mr. Knowles told me at the first conversation.

"*Q.* The claim Mr. Knowles made to you was some time prior to the time when you accepted the $300 check?

"*A.* Yes; Mr. Knowles made his claim, I think, within two or three weeks. Mr. Miller had not even moved any of the property when Mr. Knowles was introduced to me. I never paid very much attention to this matter.  *  *  *

"*Q.* And, in fact, none of the property was allowed to be removed until the money was put in your hands?

"*A.* So far as I know, the deposits were made satisfactorily; that is all.

"*Q.* The selling price of the property was $1,000?

"*A.* Yes, sir.

"*Q.* It has been all paid?

"*A.* All been paid; yes, sir. * * *

"*Q.* Your knowledge of the claim of Mr. Knowles was acquired before the money was paid to you by Mr. Miller in this case, wasn't it?

"*A.* I think so. I think Mr. Miller paid down some $300, and I think Mr. Knowles afterward paid, but I have no record of the dates. I was only concerned in one thing, and that was that the property be paid for, and that was all. * * *

"*Q.* Did you ever inform Mr. Natchez that there was any dispute about the property there in the plant?

"*A.* No, sir; I do not recall meeting Mr. Natchez, only, as I stated before, when he came in with Mr. Miller with some kind of a contract, and I was too busy to look at it, and I said: 'That is all right so far as you gentlemen are concerned. I don't know anything about your affairs, and all that I am concerned in is that you pay for the property, whoever gets it.'

"*Q.* You knew that he was purchasing this property of Mr. Miller?

"*A.* Well, I wouldn't know that only as he told me, or he and Mr. Miller came in and said they were negotiating. *

"*Q.* You did not warn him that there was some property down there that belonged to Mr. Knowles?

"*A.* No, sir.

"*Q.* You knew what Mr. Knowles claimed?

"*A.* I knew what he claimed, but I investigated, and Mr. Beach said he did not think there was any, and that was all there was of it."

A verdict was directed in favor of defendants in the following charge:

"The record may show that the motion to dismiss as to the defendants Nichols and Bush is granted, and that I think is conceded by counsel on both sides of the case is probably the proper disposition of them. As to the other defendant, Smith, I am also going to direct a verdict; and I will explain to the jury that it is a trover case, and the counsel for the defendants have raised the question that at least as to the two defendants Bush and Nichols there is no showing whatever that they were connected with the receipt

or sale of the property which was a matter of which they had no knowledge; it was entirely foreign to their affairs, and there could be no liability on their part. As to the other defendant, William J. Smith, the testimony in the case shows that whatever was done in the way of selling the property which might have belonged to the plaintiff in this case that was done through Mr. Beach and Mr. Smith's connection with it was only in a clerical capacity, in which he dictated the memorandum or contract Exhibit 5 in this case, and even in that instrument, which is the only instrument containing the terms of the sale, it is provided that the goods purchased by Mr. Miller were those that belonged to the Norka Food Company, Limited, as follows, 'all salvage belonging to the Norka Food Co., Ltd.,' so, of course, it did not contain the property of Mr. Knowles, so that there was no sale of the property of Mr. Knowles. Further than that, whatever money, if any, has been paid for any portion of that salvage was paid to the Norka Food Company, and of course passed through Mr. Smith's hands simply as treasurer, and he had nothing more to do with it than the postman who carries an envelope where it is addressed with a check in it, so that he cannot be held on the theory that he received a portion of the purchase price. It all comes to this, that if there was a conversion, it was not a conversion for which Mr. Smith was responsible, but some other party. Besides that, there is another legal reason in regard to whether or not there was a proper demand against one who had come legally into possession of property, and the evidence does not show such a demand as required by law."

Plaintiff seeks a reversal of the case in this court under two assignments of error:

"*First.* That the trial court erred in sustaining the defendant's objection to the plaintiff's tender of proof relating to a demand on the part of the plaintiff; the error being the court's refusal to permit Exhibit 2 to be read in evidence.

"*Second.* That the court erred in directing a verdict for the defendants or either of them."

190 Mich.—27.

BROOKE, J. (*after stating the facts*). We find it unnecessary to consider the first assignment for two reasons:   (1) Because Exhibit 2, a letter from plaintiff to defendant Smith written on July 6, 1914, was written after the alleged conversion, and cannot properly be construed as a demand; (2) because, under the circumstances of this case, we are of opinion that no demand was necessary before commencement of suit.   *Galvin* v. *Brass & Iron Works*, 81 Mich. 16 (45 N. W. 654) ; *Kenney* v. *Ranney*, 96 Mich. 617 (55 N. W. 982) ; and *Crozier* v. *Partrick*, 98 Mich. 349 (57 N. W. 174).

The holding of the learned circuit judge that defendant Smith could not be held liable because he acted simply in a clerical capacity is, we think, unwarranted by the facts as disclosed in the record.   While it is true that Mr. Smith testified that he dictated the memorandum of agreement for the purchase of the property, which Miller signed, his connection with the matter did not there cease.   After that memorandum was made and executed by Miller, Smith was notified by plaintiff that he claimed to own a portion of the property sold to Miller.   Smith undertook to investigate the truth or falsity of said claim, and became satisfied that it was groundless, and thereafter himself received the money for the property sold by Miller to Natchez. That an agent, as well as his principal, may be held liable for conversion in an action of trover, is settled in this State.   *McDonald* v. *McKinnon*, 92 Mich. 254 (52 N. W. 303).   See, also, 38 Cyc. p. 2056, and cases cited in note 38; 2 C. J. pp. 824, 827, and cases cited; 1 Am. & Eng. Enc. Law, p. 1131, and cases cited.

We think under the evidence a conversion was fairly made to appear on the part of defendant Smith.   *Daggett* v. *Davis*, 53 Mich. 35, 38 (18 N. W. 548, 51 Am. Rep. 91) ; *Gibbons* v. *Farwell*, 63 Mich. 344 (29 N. W.

855, 6 Am. St. Rep. 301); *Crane Lumber Co.* v. *Bellows,* 116 Mich. 304 (74 N. W. 481).

A verdict was properly directed in favor of defendants Bush and Nichols, as there was no evidence tending to connect them with the unlawful conversion.

The judgment is reversed, and a new trial ordered.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, STEERE, and PERSON, JJ., concurred.