In the Matter of DURAND MILLING COMPANY, INC.

Larry PICKLER and Jack Vasicek, Plaintiffs,

v.

DURAND MILLING COMPANY, INC. and Dean R. McConkey, Defendants.

Bankruptcy No. 79–60110.
Adv. Nos. C–5 and C–6.

United States Bankruptcy Court, E. D. Michigan, S. D.

Feb. 20, 1981.

Robert M. Crites, Flint, Mich., for plaintiffs.

Roland F. Rhead, Lansing, Mich., for defendants.

## OPINION

HAROLD H. BOBIER, Bankruptcy Judge.

### STATEMENT OF FACTS

Durand Milling Company, Inc. ("Durand") was a grain elevator operation in Durand, Michigan for more than 15 years. It was a Michigan corporation with a primary business purpose of processing, selling and storing various types of grain. Its president and chief operating officer during all relevant times of the present lawsuit was Dean R. McConkey ("McConkey").

During the latter part of 1977 and early part of 1978, Jack Vasicek ("Vasicek") delivered soy beans and wheat to Durand, and received in return, documents known as and referred to throughout the trial as weight slips. The weight slips indicate the type of grain delivered, its moisture content, total amount of grain and by whom the grain was delivered. In 1978, Larry Pickler ("Pickler") delivered soy beans to Durand and also received weight slips in return.

In addition to the information set forth above, the weight slips are consecutively numbered and contain the following statement: "All Grain Considered *STORED* Unless Other Arrangements Have Been

Made." There are no other written agreements which would help define the relationship between the parties.

None of the grain delivered to Durand by Vasicek and Pickler was ever returned or paid for by Durand. The total amount of grain delivered was approximately 4,650 bushels of soy beans and 1,750 bushels of wheat.

On March 5, 1979 Durand filed a voluntary petition in this Court under Chapter IV of the Bankruptcy Act ("Act"). Vasicek and Pickler filed proofs of claim on April 10, 1979 in the amounts of $30,914.06 and $9,772.71 respectively. On June 11, 1979 Vasicek and Pickler each filed a complaint against Durand and McConkey which demanded judgments against both Durand and McConkey for conversion, to pierce the corporate veil of Durand, and to determine the dischargeability of the debts.

A continuing trial was conducted on December 19, 1979, January 14, February 4 and February 8, 1980. At the request of the Court, the parties have submitted memorandum briefs to support their respective positions.

### ISSUES

The legal issues which need to be resolved are as follows:

1. Are the plaintiffs, Vasicek and Pickler, entitled to a money judgment pursuant to the Michigan Grain Dealers Act against Durand, in its corporate capacity, and McConkey, in his individual capacity?

2. If so, under the facts of this case, are the debts owing to Vasicek and Pickler nondischargeable pursuant to Section 17(a)(2) of the Bankruptcy Act?

### OPINION AND ORDER

The Michigan Grain Dealers Act ("Grain Act") was signed into law on August 12, 1976 by the governor of the State of Michigan and was to have immediate effect. M.S.A. §§ 12.119(1) *et seq.*; M.C.L.A. §§ 285.61 *et seq.* In essence, the Grain Act was an amendment to the Farm Produce Storage Act. Although there have been no reported decisions under the Grain Act, there is at least one decision under the Farm Produce Storage Act. *See U. S. v. Haddix & Sons, Inc.,* 415 F.2d 584 (6th Cir. 1969).

It is the opinion of this Court that the Grain Act is dispositive of the primary issues in this case. For example, there has been a dispute over the nature of the relationship between the parties based on the weight slips. Section 2(f) of the Grain Act offers a possible definition of a weight slip as a "scale ticket" or "acknowledgment form." That section states as follows:

'Acknowledgment form' means a written receipt issued by a grain dealer or his or her authorized representative to a farm produce owner which identifies the produce being transferred from the physical jurisdiction of the owner to the dealer. 'Scale ticket' is synonymous with acknowledgment form if used to describe weighed quantities of farm produce. M.S.A. § 12.119(2)(f); M.C.L.A. § 285.-62(f) (Supp.1980).

During the course of the present litigation the parties have referred to the documents which were executed at the time of the delivery of the grain as "weight slips." It is clear from the testimony received at trial that the weight slips were used to identify the grain being transferred. Therefore, the Court shall use the terms "acknowledgment form," "scale ticket" and "weight slip" interchangeably.

Once a farm produce owner has delivered his grain to the grain dealer and received an acknowledgement form, there are no further steps necessary on the part of the owner to protect his property rights. However, under the Grain Act the grain dealer is under an affirmative duty to issue a warehouse receipt to the owner within 30 days of delivery of the produce. To use the words of the statute:

Upon delivery of farm produce for storage by a person to a grain dealer licensed under this act, the grain dealer within 30 days thereafter shall deliver to the owner of the farm produce so stored a warehouse receipt ... M.S.A. § 12.119(9)(1); M.C.L.A. § 285.69(1).

Along with other specified information, a warehouse receipt issued by a grain dealer must include:

A statement as to whether the farm produce stored is to be stored separately or commingled as fungible goods. A grain dealer shall be liable under the provisions of the uniform warehouse receipts act of Michigan, to a person injured thereby for all damages caused by omission from a warehouse receipt of any terms herein required for the negotiable or nonnegotiable receipt as issued. M.S.A. § 12.-119(9)(1)(j); M.C.L.A. § 285.69(1)(j).

Through incorporation by reference, the Grain Act adopts the applicable provisions of the Michigan Uniform Warehouse Receipts Act ("U.W.R.A."), which has been substantially superceded by Article 7 of the Uniform Commercial Code ("U.C.C."). Under the U.C.C., a warehouseman is liable in damages for "his failure to exercise such care . . . as a reasonably careful man would exercise under like circumstances." M.S.A. § 19.7204(1); M.C.L.A. § 440.7204(1). Section 7–203 of the U.C.C. further provides:

A party to or purchaser for value in good faith of a document of title other than a bill of lading relying in either case upon the description therein of the goods *may recover from the issuer damages caused by the non-receipt or misdescription of the goods* . . . (Emphasis added.) M.S.A. § 19.7203; M.C.L.A. § 440.7203.

▮ Clearly, the statutory scheme is complete with respect to the meaning of the relationship between the parties involved in the present adversary proceedings, their respective duties and obligations, as well as their liabilities and remedies. The relationship between the parties is one of bailment. The weight slips (i. e., acknowledgment forms) received by the plaintiffs herein sufficiently described the goods delivered by the plaintiffs to the defendants.

▮ Under the Grain Act, Durand was obligated to issue the plaintiffs warehouse receipts within 30 days of the delivery of the grain. M.S.A. § 12.119(9); M.C.L.A. § 285.69. Therefore, the plaintiffs are to be treated as the holders of non-negotiable warehouse receipts for the amounts and types of grain indicated on the weight slips. Since Durand has failed to either pay or re-deliver the goods to the plaintiffs there is at a minimum, a breach of contract, based on an unlawful conversion, and accordingly, the plaintiffs are entitled to a money judgment.

The holding of the Court to the effect that the plaintiffs are entitled to judgment is not dispositive of all the issues which need to be resolved. The plaintiffs have also sought a judgment against defendant McConkey individually and have asked the Court to determine the dischargeabilty of the debts. In addition, there remains a question as to the amount of damages.

With respect to McConkey's individual liability for the damages owing to the plaintiffs, the theory of recovery advanced by the plaintiffs in their complaints was that "the corporate veil be pierced and that these defendants [be], jointly and severally, personally liable . . . for the total amount of the debt."

Prior to the commencement of trial counsel for the plaintiffs, on the record, abandoned the request to pierce the corporate veil. The abandonment of that portion of the plaintiffs' complaints was reaffirmed during the course of trial. However, it is not necessary to pierce the corporate veil to impose personal liability on defendant McConkey. It must be remembered that the primary basis for any liability in these adversary proceedings is conversion. American Jurisprudence provides the following explanation of liability for a bailee's conversion:

If a bailee actually converts property he is answerable therefor, no matter how good his intentions or how careful he has been. If the wrongful act is intentionally done, it is immaterial that the bailee may have mistakenly believed that he was acting within his legal rights. For example, wherever a person, entrusted with the goods of another, puts them into the hands of a third person without orders, it is apparently now the settled rule that

such a delivery to an unauthorized person is as much a conversion as a sale of the property or an appropriation of it to the bailee's own use would be, and that in such cases neither a sincere and apparently well-founded belief that the tortious act was right, nor the exercise of any degree of care, constitutes a defense even to a gratuitous bailee. That there is an absolute liability for conversion in such cases without regard to the question of due care or degree of negligence, is now regarded as an established legal principle, applicable to bailments of every description. 8 Am.Jur.2d, *Bailments*, § 109, at pp. 1007–08.

The law of bailments in Michigan is likewise well settled. In the case of *Bush v. Hayes*, 286 Mich. 546, 282 N.W.2d 239 (1938), the plaintiff had delivered beans to a grain elevator and did not receive a warehouse receipt in return. The bags of beans were tagged, however, by an employee of the grain elevator which indicated that the beans belonged to the plaintiff. Several months after delivery, the plaintiff returned to the elevator and demanded possession of his beans from two different employees who were in charge of the business. After several ensuing conversations between the parties, the plaintiff was without his beans or a warehouse receipt to evidence his ownership. In words fully applicable to the present proceedings, the Michigan Supreme Court stated:

If there has been a conversion in which they [the individual defendants] participated they are liable. It is of no consequence whether they acted for the corporation or acted for themselves if they were active participants in converting beans which belonged to plaintiff. They are liable for the torts which they commit, be it for themselves or for another. *Id.* at 549–50, 282 N.W.2d 239.

In addition to the case of *Bush, supra,* two other Michigan Supreme Court decisions are worthy of comment and helpful to a resolution of the extent of McConkey's liability. The first case is *Knowles v. Smith*, 190 Mich. 409, 157 N.W. 276 (1916) wherein the court stated:

That an agent, as well as his principal, may be held liable for conversion in an action in trover, is settled in this state. *Id.* at 418, 157 N.W. 276.

The second case is *Hempfling v. Burr*, 59 Mich. 294, 26 N.W. 496 (1886) which involved stock certificates given by the plaintiff to the defendant as a pledge for a note. The defendant, who was an officer of the bank which held the note, relinquished possession of the stock to a third party and the plaintiff sued for conversion. The defendant raised the defense that he could not be found personally liable for the conversion because he was merely acting as an officer of the bank. On this issue the court stated:

To set up official responsibility as the only one existing is equivalent to claiming that the bank is liable for the cashier's fraud, and the cashier himself not liable. This is a very singular result, and one which is too unreasonable to bear consideration. A party defrauded may have more than one wrongdoer, actual or constructive, to look to for redress, but the active wrongdoer is always responsible for his own frauds. *Id.* at 296, 26 N.W. 496.

During the course of the trial McConkey testified that there were potentially five different methods of transacting business between Durand and its customers. With respect to the type of transaction involved in the present litigation, McConkey testified that the receipt of a weight slip would indicate that the person to whom the weight slip was issued would have the option of either storing the grain until such time as the farmer needed it, or sell it at a later date. In other words, the farmer could elect to store the grain for future use or could determine the date and price of sale at a later time. In either event, the farmer would be charged for storage at a predetermined rate.

McConkey further testified that plaintiff Vasicek never made a demand for the return of the grain he delivered to Durand, nor did he ask for payment. As to the grain deposited by Pickler, however,

McConkey stated that he was to receive $7.00 per bushel of soy beans during the first part of March, 1979. In addition, on numerous occasions during the course of trial McConkey "assumed" or "believed" that the grain delivered by the plaintiffs was sold and the proceeds used to cover the expenses of the business. It was not clear whether McConkey was referring to Durand when he testified as to "the business" or one of the other enterprises he was involved in which had a use for such grain. At a minimum the record clearly indicates that the plaintiffs never received either their grain or money, and that the grain was sold to pay off expenses.

■ Based on the foregoing facts and cases cited herein, it is the holding of this Court that the amounts owing from Durand to the plaintiffs are debts for which McConkey is personally liable based upon his conversion of the grain. As to the actual amount of the damages, Pickler is entitled to $7.00 per bushel for the 1,316 bushels of soy beans he delivered, less storage charges from the time he delivered the beans until he made a demand for their return. Vasicek, on the other hand, did not make a demand for either his grain or its money equivalent. Therefore, he is entitled to the prevailing price for the 3,335.2 bushels of soy beans and 1,751 bushels of wheat which he delivered as of March 5, 1979, the date the petition in bankruptcy was filed, less applicable storage charges. These amounts are in conformance with the rationale applied in the case of *Bates v. Stansell*, 19 Mich. 91 (1869).

■ As to the dischargeability of the debts owing from the defendants to the plaintiffs, it is well settled law that a conversion of property is a basis for denying the discharge of a debt. In order to be so, however, the act of conversion must be "willful and malicious," as these words are used in section 17(a)(2) of the Bankruptcy Act. Both in the cases of *Tudryck v. Mutch*, 320 Mich. 86, 30 N.W.2d 512 (1948) and *Fruchter v. Martin*, 350 Mich. 12, 85 N.W.2d 125 (1957), the Michigan Supreme Court has held that the liability for a con-

version of property cannot be discharged in bankruptcy. In *Fruchter*, Justice Voelker personalized the court's decision when he stated:

If a man borrows my wife's diamond ring for a specific purpose and then turns around and sells it to a stranger without her knowledge and consent and further refuses to account for the proceeds but instead goes into bankruptcy, we are offhand unable to divine what kind of behavior this is, if it is not willful and malicious. *Id.* at 20, 85 N.W.2d 125. *See also* 1A Collier on Bankruptcy ¶ 17.09 (14th Ed.) for an exhaustive review of other illustrative cases on this issue.

■ The record is persuasive, and this Court so finds, that defendant McConkey knowingly, and deliberately sold the plaintiffs' grain without accounting for it whatsoever. He was aware of the fact that he had no title to the grain and that he knowingly disposed of it without any reasonable expectation that he could pay for it on demand. The record further discloses that other producers who delivered grain to the defendants for storage and then demanded its return were promised by McConkey that they would receive either their grain or its money equivalent when McConkey knew he could not deliver either. Therefore, it is the opinion of this Court that the plaintiffs have proven all the elements of an unlawful conversion. McConkey deliberately disposed of the plaintiffs' property; it was a willful and malicious act and he knowingly caused injury to the plaintiffs to the extent of the losses they incurred by his knowing and deliberate conversion of their grain. There is no question that McConkey's conduct was willful and malicious as contemplated in Section 17(a)(2) of the Bankruptcy Act.

The cases decided under similar circumstances have consistently held that a deliberate and intentional conversion of property constitutes a "willful and malicious" act as contemplated in Section 17(a)(2) of the Act. For example, in the early case of *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1903), the United States Supreme

Court established the general rule as follows:

> . . . a willful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the exception.
>
> It is urged that the malice referred to in the exception is malice towards the individual personally, such as is meant, for instance, in a statute for maliciously injuring or destroying property, or for malicious mischief, where mere intentional injury without special malice towards the individual has been held by some courts not to be sufficient.
>
> We are not inclined to place such a narrow construction upon the language of the exception. We do not think the language used was intended to limit the exception in any such way. It was an honest debtor, and not a malicious wrongdoer, that was to be discharged. (Citations omitted.) *Id.* at 487–88, 24 S.Ct. at 509.

Although the *Tinker* case did not involve a conversion of property, the above quoted language was reiterated by the Supreme Court in the case of *McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916). In *McIntyre*, the bankrupts, who were partners in a stock brokerage firm, had converted the plaintiff's stock certificates and deposited the proceeds in a bank account which belonged to the firm. In affirming a money judgment which was determined to be nondischargeable, the Court stated:

> To deprive another of his property forever by deliberately disposing of it without semblance of authority is certainly an injury thereto within common acceptation of the words. And this we understand is not controverted; but the argument is that an examination of our several Bankruptcy Acts and consideration of purpose and history of the 1903 amendment will show Congress never intended the words in question to include conversion. We can find no sufficient reason for such a narrow construction. And instead of subserving the fundamental purposes of the statute, it would rather tend to bring about unfortunate if not irrational results. Why, for example, should a bankrupt who had stolen a watch escape payment of damages, but remain obligated for one maliciously broken? (Citations omitted.) *Id.* at 141, 37 S.Ct. at 39.

The *Tinker* and *McIntyre* decisions have been frequently cited by the courts for the proposition that a deliberate and intentional conversion of property is a willful and malicious act which cannot be discharged in bankruptcy. *In re Stenger*, 283 F. 419 (E.D.Mich.1922). And the more recent cases have not altered the general rule, nor have they come to different conclusions. *In the Matter of Amador*, 596 F.2d 428 (10th Cir. 1979) (Conversion of inventory subject to secured interest.); *Bennett v. W. T. Grant Company*, 481 F.2d 664 (4th Cir. 1973) (Deliberate and intentional act of conversion is not dischargeable even in absence of special malice.).

Therefore, for the reasons set forth herein, it is the holding of this Court that the defendants, Durand and McConkey, are jointly and severally liable to the plaintiffs, Pickler and Vasicek, based on the willful and malicious conversion of the grain delivered by the plaintiffs to the defendants. In addition, it is the considered opinion of this Court, based on the records and files herein as well as a review of the testimony adduced at trial, that the debts owing by the defendants to the plaintiffs are not dischargeable pursuant to Section 17(a)(2) of the Bankruptcy Act.

The Court shall enter judgment in accordance with this opinion upon proper presentment of an order by counsel for the plaintiffs.