**In the Matter of BINIECKI BROTHERS, Debtor.**

**Basil T. SIMON, Trustee, Plaintiff,**

**v.**

**EICHSTADT BROS., Defendant.**

**Bankruptcy No. 82–04691–BE. Adv. No. 83–2201.**

United States Bankruptcy Court, E.D. Michigan, S.D.

March 23, 1984.

---

Kenneth M. Schneider, Detroit, Mich., for trustee.

Durward L. Hutchinson, Monroe, Mich., for Eichstadt Bros.

## MEMORANDUM OPINION

STANLEY B. BERNSTEIN, Bankruptcy Judge.

*Introduction*:

The Biniecki Brothers formed a partnership to operate a grain elevator in Livingston County. The partnership failed and its Chapter 11 case filed on August 19, 1982, was converted to Chapter 7. The trustee has filed over fifty preference complaints against farmers who had traded with the partnership. This is the first of these adversary proceedings to be tried, and the outcome of this proceeding will probably establish the pattern of settlement or prosecution for the remaining proceedings.

A proper determination of the preference claims in this proceeding requires a comprehensive consideration of the basic relationships between farm producers and grain dealers as regulated by the Michigan Department of Agriculture (MDA). From another perspective, this proceeding illuminates the lurching movement from "ab-

stract rights" to "paper rights."[1] What frustrates both parties is a state regulatory scheme of prescribed form documents which bears little correspondence to agricultural marketing practices. In a word, this regulatory system of "paper rights" distorts reality.

We must begin then with an exposition of the regulatory system. Once we understand that state system, we shall then be in a position to consider the overlay of the federal bankruptcy system.

The Grain Dealers Act, M.C.L.A. §§ 285.-61 *et seq.*, imposes a prescribed set of form documents to evidence three basic alternative relationships between the farm producer and the grain dealer. At bottom, the farm producer may elect among the following alternatives:

(1) To sell grain[2] to the grain dealer for cash upon delivery;

(2) To deposit grain with the grain dealer for storage; or

(3) To sell grain to the grain dealer for a posted price to be determined on a later date of the seller's choice.

When grain is delivered under any of these three alternatives, the grain is weighed upon the dealer's scale and described by crop, moisture content, grade, and weight. At that point, the dealer issues a "scale ticket" with the appropriate data. M.C.L.A. § 285.62(f) defines an "acknowledgment form" as "a written receipt issued by a grain dealer or his or her authorized representative to a farm produce owner which identifies the produce being transferred from the physical jurisdiction of the owner to the dealer. 'Scale ticket' is synonymous with acknowledgment form if used to describe weighed quantities of farm produce." If the grain is delivered for an immediate cash sale, the scale ticket will be priced and paid.

If the grain is not delivered for immediate sale, the farm producer has to elect either to store the grain with the dealer

*qua* warehouseman or to sell it to the grain dealer for a price to be determined at a later date. Michigan farmers customarily refer to these sales as "price laters." The dealer is obligated to issue a statutorily prescribed form of grain receipt within thirty days of delivery, if the producer elects to retain title to the grain. This is the classic bailment. M.C.L.A. § 285.69(1) requires that "upon delivery of farm produce for storage by a person to a grain dealer licensed under this Act, the grain dealer within 30 days after delivery shall deliver to the owner of the farm produce stored a warehouse receipt ..." A "warehouse receipt" is defined under M.C.L.A. § 285.62(i) as "a written acknowledgment issued by the grain dealer to a farm produce owner upon acceptance of the produce for storage in the dealer's facility."

Some confusion is introduced by defining a scale ticket as an acknowledgment and then referring to a grain receipt as a written acknowledgment. The scale ticket "acknowledges" the initial delivery of grain to the elevator. A grain receipt "acknowledges" a bailment. To complete this chain, one could say that a price later agreement "acknowledges" a sale at a price to be later determined. It is important not to confuse the "scale ticket" with a "grain receipt." Although both are species of written acknowledgment forms, each serves a different function. The scale ticket is, at best, a temporary document which is supposed to be replaced within thirty days with either a grain receipt or a price later agreement (unless it is a cash transaction.)

The dealer is obligated to issue a prescribed form of price later agreement within thirty days of delivery, if the producer elects to sell the grain at a "price later." M.C.L.A. § 285.69a(1) requires that "if farm produce which is received by a grain dealer is not received pursuant to a bailment or a cash sale, the grain dealer, not more than 30 days after receipt, shall pro-

---

1. See Clark, "Abstract Rights Versus Paper Rights Under Article 9 of the Uniform Commercial Code, 84 Yale L.J. 445 (1975).

2. "Grain" is used to refer to grain and other commodities.

vide the grower or owner of the farm produce with a price later agreement."

The documentary system breaks down, however, when the dealer fails to issue either the grain receipt or the price later agreement. All that the farm producer has is an "unsettled scale ticket." There is no statutory presumption that one or the other alternative is deemed elected if a document to replace the scale ticket is not issued.

In *In re Durand Milling Co., Inc.*, 9 B.R. 669 (Bkrtcy.E.D.Mich.1981), my predecessor, the Hon. Harold A. Bobier, read into the statute the presumption that a bailment is created when grain is delivered and no document has been issued. He treated the "scale ticket" as a "non-negotiable warehouse receipt." That may have aided the result the court wished to reach in a complaint for nondischargeability against the elevator operator for his acts of conversion, but that outcome is not compelled by the statute. Indeed, the predominant practice in the industry is not to store under receipts, but to sell under price later agreements. This is primarily due to the fact that grain dealers form the marketing link—storage is a secondary aspect of their operations. Even if a producer holds a grain receipt, he will usually sell the grain to the grain dealer at a later date. Rarely does a producer assign his receipts as collateral to secure new borrowings. Under these circumstances, grain receipts and price later agreements become functional equivalents.

There is, however, a significant legal difference between grain receipts and price later agreements. The grain receipt is a document of title, and the secured creditor or judgment creditor of the grain dealer cannot attach grain held under receipts. The grain is not owned by the grain dealer; the dealer is just the bailee under the farm producer's bailment. To the contrary is the case of grain sold to the grain dealer under price later agreements. The grain is owned by the grain dealer, and the seller is but an unsecured creditor with a contingent claim. The claim is contingent, not as to liability, but as to amount. The holder of a price later agreement loses to the secured creditor or judgment creditor of the grain dealer. Unfortunately, since farmers tend to ignore the differences in the two forms of "paper," and price laters are the dominant mode, the producers frequently find themselves frustrated by a legal structure which they ignore or about which they are ignorant.

The construction of scale tickets under the Grain Dealers Act as "non-negotiable receipts" proffered in *Durand Milling, supra,* is, if followed, prejudicial to agricultural lending practices. A secured lender to the grain dealer or elevator operator expects, when it has perfected a blanket security interest in all the personal property of the elevator, to include the elevator's inventory and proceeds. Since the grain delivered under a "price later" is included within this dealer's inventory, the *Durand Milling* analysis, if followed, would deny attachment of the lender's security interest to that grain. As such, *Durand Milling* is a disincentive to secured lending to elevator operators, and threatens to defeat the ability of the operator to obtain working capital loans.[3] This Court is fairly certain that my predecessor did not intend that result, but that is the logical consequence.

To be sure, farm producers who sell their grain to an elevator operator on "price laters" run the risk that the operator will be insolvent on the date that the producer demands payment on the posted price. The producer also runs the risk that the grain he had earlier delivered and transferred will be subject to execution by a creditor having a judgment against the elevator operator. And it may well be that farm producers do not fully understand these risks under state law remedies; they surely do not understand the risks of preferential recoveries by bankruptcy trustees. On

**3.** Prior to appointment to this Court, I represented the St. Paul Bank for Cooperatives, the primary agricultural lender to elevator coops in the Midwest, in a liquidating Chapter 11 case involving an elevator in Hemlock, Michigan.

recent occasion the farmers' reactions to bankruptcy cases filed by or against elevator operators have bordered on civil insurrection. *See State of Missouri v. United States Bankruptcy Court*, 647 F.2d 768 (8th Cir.1981).

## I. SOYBEANS

*Facts:*

In this proceeding, the undisputed facts are that the defendant delivered quantities of soybeans and corn on various dates in mid-October of 1981. Scale tickets were issued by the debtor covering each of these deliveries. The debtor's bookkeeper testified that at that time the elevator only dealt in "price laters," and did not accept grain for storage under grain receipts. The defendant did not cross-examine the debtor's witness on this point, nor offer any rebuttal testimony.

The "paper" aspects to these transactions differed by crop. Scale tickets were issued for the soybeans with a handwritten entry, "storage," under the comments section. Price later agreements were subsequently issued by the debtor to the defendant. On May 26, 1984, the defendant settled its account on the soybeans. The price later agreements were surrendered, the then posted price for soybeans was applied to the various quantities described in the agreements, and deductions from the purchase price were made for various drying and storage charges and for the defendant's prior purchases of merchandise on open credit from the debtor's supply store. The sales price of the merchandise so credited was $1,615.18. The debtor's check for the net balance in the amount of $1,770.91 was issued to the defendant on May 26, 1982. The trustee alleged a preferential transfer in the amount of the check and for the credit on the merchandise totalling $3,386.09. For purposes of this analysis both the payment by check and the credit for merchandise will be referred to as payment.

■ The trustee argued that the payment was for an antecedent indebtedness.

The trustee relies upon the sale of the soybeans having been made on the dates of delivery of the soybeans by the defendant to the debtor. The indebtedness was incurred by the debtor on the dates of delivery—the liability was fixed, only the amount of the indebtedness remained to be determined.

The defendant argued that the debt was not incurred until it was "priced" on May 26, 1982, and by way of an affirmative defense, that the transaction involved a "substantially contemporaneous exchange" on the date of settlement.

The trustee has the better argument. Under state law, the transfer of ownership of the soybeans to the debtor occurred on the date of delivery. Since the defendant elected to sell on a price later basis, the liability arose on the date of transfer of ownership and the dealer was required to include that grain on his "position reports" as "house inventory." A more conventional formulation is just to describe the farmer as a seller with an account receivable.

■ The defendant has also argued that it has an equitable lien on the soybeans to secure payment of the price. By implication, the defendant would treat the payment as satisfaction of a secured indebtedness and, therefore, excluded from the scope of voidable transfers. (The defendant did not articulate this argument; it just invoked an equitable lien as if that were dispositive.) To support that analysis, the defendant relies upon a troublesome and ambiguous provision under the Grain Dealers Act, M.C.L.A. § 285.79, that authorizes the director of the MDA to suspend the grain dealer's operations for violations of the Act and to liquidate the dealer's entire inventory, including grain held for storage and under price laters. The provision states:

For the protection of holders of warehouse receipts or price later agreements .. the director ... shall seize ... the assets of the grain dealer involved for the account of the holders of his outstanding warehouse receipts and price later agreements. Upon revocation of a

grain dealer's license, the director may liquidate, for the account of the holders of the warehouse receipts and price later agreements, the grain dealer's access and provide for an equitable distribution of those assets among the holders of warehouse receipts and price later agreements to the extent of their value, if possible, and provide for the return to the grain dealer of any remaining assets.

The defendant construes this section as imposing a pro-rata distribution of bailed and "price-later" grain. That reading is inconsistent with the ownership rights of receipt holders—if insufficient proceeds were available to cover both classes, the receipt holders would suffer a loss of their property. The more sensible construction is to pay the receipt holders first, and then pay holders of price laters. Even that approach may leave other unsecured creditors without a remedy if the only significant unencumbered asset of the grain dealer is the grain inventory. It should be apparent that since seizure is often triggered by the grain dealer's insolvency, this provision creates a statutory priority which would be avoidable under bankruptcy. For it appears that if there is an equitable lien in favor of price laters, it arises only upon seizure and liquidation by the director of the MDA.

For the purposes of analysis, if this equitable lien arose upon the date of seizure, it would secure an antecedent indebtedness, so that would not exclude this transaction from recovery as a preference. In this case, the equitable lien was not triggered—there was no seizure and liquidation. To complete the analysis, even if the equitable lien related back to the date of delivery, there is no assurance that the lien holder would be fully secured, and any payments on the deficiency amount would still be preferential. Under any reasonable construction, the "equitable lien" is no defense to recovery by the trustee.

■ The defendant also raised the defense that storage charges were deducted from the purchase price, and that vitiates the price later agreement. First of all, the

defendant acknowledged the validity of the charges by accepting the net payment. Secondly, the custom in this industry is to charge for storage on price laters because space in the elevators is being used that could otherwise be used for bailed grain, if any, and because the dealer builds in an incentive to have the farmer settle on the price as early as possible. Thirdly, the Grain Dealers Act does not prohibit charging for storage under a price later agreement.

In light of the foregoing, the trustee has proven all the elements of his claim to recover a voidable transfer for the soybeans in the amount of $3,386.09.

## II. CORN

*Facts*:

We now turn to the transaction in corn. In this instance, scale tickets were issued and marked "storage" in the comments section just as had been done with the soybeans. No grain receipt or price later agreement was subsequently issued. An "advance payment" of $2,000.00 was made by the debtor on June 25, 1982. Within ninety days of the Chapter 11 petition, the debtor also credited $608.99 for prior credit purchases by the defendant of merchandise from May 21 through June 22, 1982, against the debtor's purchase price on the corn. Thus the trustee seeks to recover $2,608.99 as preferential transfers relating to the corn transactions. (The balance of the purchase price of $16,000 for the corn, less credits for the $2,000 advance payment and for other accrued charges, was evidenced by a note. The note was never paid.)

*Analysis*:

■ The trustee argued that the parties through their course of dealing intended this transaction to be a price later sale, and that the handwritten word "storage" did not convert this transaction into a bailment. This Court finds that the trustee's characterization of the transaction is correct. The debtor's bookkeeper testified that the debtor did not issue receipts, just price

laters; no rebuttal testimony was introduced to controvert that testimony.

The defendant argued that under the Grain Dealers Act, unless the transaction is a cash sale or a bailment, it is a price later sale. That is formally correct, but it begs the question—what did the parties intend? If the parties intended a price later, then the duty of the grain dealer to issue a price later agreement was breached. That breach does not convert the transaction into a bailment. As discussed earlier, the *Durand Milling* analysis is simply in error, and the defendant's reliance on that decision is misplaced.

The defendant may learn from this litigation that it must insist upon grain receipts if it wishes to avoid preference attacks by the elevator's trustee. If the farmer wants to speculate on the market, he can bail his grain under receipts and sell it later to the elevator at posted prices.

The trustee has proven the elements of a voidable preference concerning the corn transaction in the amount of $2,608.99.

A separate judgment for the trustee in the aggregate amount of $5,995.08 has been entered on this date.