In re MAYVILLE FEED & GRAIN, INC., Debtor.

Duane La BAIR, Mitchell La Bair, George McMullen, Bob Steele d/b/a Steele Dairy Farm, Edmond Stephens and Edward Stephens, Gerald Stout, Keith Tedford, Wildrex Thornton, Harold White, Daniel Day, Mark Stout and Bernard Cobb, Plaintiffs,

v.

MAYVILLE FEED & GRAIN, INC., State of Michigan, Department of Agriculture, and Michigan Millers Mutual Insurance Company, Defendants.

Bankruptcy No. 86–09192.
Adv. No. 86–9119.

United States Bankruptcy Court,
E.D. Michigan, N.D.

Jan. 19, 1989.

Thomas D. Abbey, Caro, Mich., for plaintiffs.

R. Earl Selby, Bay City, Mich., for trustee, pro se.

Suzan M. Sanford, Milwaukee, Wis., Asst. Atty. Gen., for State of Mich.

John R. Barnes, for Michigan Millers Mut. Ins. Co.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARTHUR J. SPECTOR, Bankruptcy Judge.

The plaintiffs are farmers who delivered grain to Mayville Feed and Grain, Inc. (hereinafter referred to as "the elevator") during the years 1984, 1985 and 1986. The elevator filed its voluntary petition for relief under Chapter 7 of the Bankruptcy Code on April 10, 1986. All of the grain in the elevator was sold by the Chapter 7 trustee, R. Earl Selby, a few days later. The proceeds of that sale were $65,927.63. Thereafter, in conjunction with the Michigan Department of Agriculture ("Department"), applying Michigan law[1] and pursuant to 11 U.S.C. § 557, the trustee distributed $19,090.91 as payment in full of the claims of all farmers who submitted to him satisfactory proof that they held warehouse receipts for crops stored in the elevator. The trustee then made a motion to disburse the remaining proceeds to those farmers who lacked such adequate documentation on a *pro rata* basis under the priority provided in § 507(a)(5)(A) of the Bankruptcy Code. The plaintiffs objected to the trustee excluding them from the full payment provided to the class of farmers who held warehouse receipts. This action then ensued.

Because of the shortage of grain, this is a suit between a class of creditors who do not actually hold warehouse receipts (the plaintiffs) against a class of creditors (represented by the trustee) who also lack warehouse receipts but who did not bring suit. This is so because to the extent the plaintiffs are deemed to be constructive warehouse receipt holders, there will be less, or perhaps nothing, left to distribute to the other "undocumented" farmer-creditors.

The plaintiffs have also sued Michigan Millers Mutual Insurance Company on its bond which runs to the Department, and which the elevator was required to obtain to get a license to do business in this state. The plaintiffs seek to stack the $20,000 bond for each of the last three years of the elevator's operations for an aggregate liability of $60,000.

The following are the Court's findings of fact and conclusions of law, pursuant to Bankruptcy Rule 7052, in this adversary proceeding which was tried over an extended period of time.

Mayville Feed and Grain, Inc. was both a storage facility for grain and a dealer of grain in its own right at all material times. The plaintiffs failed to obtain warehouse receipts from the debtor on the forms dictated for such purposes by the Department of Agriculture pursuant to the directives of the Michigan Grain Dealers Act, Mich. Comp.Laws § 285.69; Mich.Stat.Ann. § 12.119(9).[2] Likewise, they failed to obtain price later agreements on the authorized form. Instead, they presented as evidence of their alleged rights to the grain in question, scale tickets, also known as "weight slips". These scale tickets or weight slips are merely receipts indicating the type and quantity of grain delivered by the farmer to the elevator, as well as the date of delivery. Each of the weight slips presented as evidence bore the words "NOT A STORAGE WAREHOUSE RECEIPT".

The Court adopts the stipulated facts as to the amount of grain at issue as set forth in the Joint Final Pre–Trial Statement filed May 23, 1988. Accordingly, the plaintiffs respectively delivered the following quantities of grain to Mayville Feed & Grain, Inc. Unless otherwise noted, all of the deliveries occurred between March 21, 1985 and March 20, 1986.

---

1. A statute provides that upon insolvency of a grain dealer, the produce on hand "shall be first applied to the redemption and satisfaction of the warehouse receipts issued by that grain dealer as the bailee." Mich.Comp.Law. § 285.68; Mich.Stat.Ann. § 12.119(8).

2. "(1) Upon delivery of farm produce for storage by a person to a grain dealer licensed under this act, the grain dealer within 30 days after delivery shall deliver to the owner of the farm produce stored a warehouse receipt of a form approved by the director ...". Mich.Comp. Laws § 285.69(1).

A. Duane LaBair delivered 6,930.45 bushels of corn;

B. Mitchell LaBair delivered 2,000 bushels of corn;

C. George McMullen delivered 719.17 bushels of wheat and 1,423.17 bushels of soybeans;

D. Edmond and Edward Stephens delivered 9,305.34 bushels of corn;

E. Gerald Stout delivered 2,692.63 bushels of corn;

F. Keith Tedford delivered 4,697.46 bushels of corn;

G. Daniel Day delivered 7,043.55 bushels of corn in November, 1984 and 9,604.36 bushels of corn from August, 1985 through January, 1986;

H. Mark Stout delivered 4,655.27 bushels of corn and 239.35 bushels of soybeans;

As to the plaintiffs about whom the parties have not stipulated concerning either the type or the quantity of grain delivered, the Court finds that:

I. George McMullen delivered 2,500 bushels of oats;

J. Wildrex Thornton delivered 8,500 bushels of corn;

K. Bernard Cobb delivered 2,085 bushels of corn.

L. With the exceptions of plaintiffs George McMullen, Daniel Day and Wildrex Thornton, the plaintiffs hold only unsettled scale tickets as evidence of any interest in the above described grain. These three plaintiffs hold price later agreements. No plaintiff has presented to this Court a properly executed warehouse receipt.

M. Plaintiffs Day and Thornton did execute price later agreements under what they allege to be questionable, possibly fraudulent circumstances some time shortly before the debtor was closed down by the Department and filed its petition for relief with this Court. Day's and Thornton's allegations of fraudulent inducement are without merit as they have failed to prove any of the material elements of fraud.[3] Such determination does not affect this Court's principal holdings.

N. George McMullen proved that he was a common law bailor and that a price later agreement was not intended. However, since he too failed to obtain a written warehouse receipt, he is in no better position than the other undocumented plaintiffs.

O. The price of the commodities when the elevator's inventory was liquidated, shortly after the bankruptcy petition was filed are: $2.13 per bushel of corn; $2.80 per bushel of wheat; $1.15 per bushel of oats. No soybeans were sold at that time.

P. The elevator violated one of the provisions of the Grain Dealer's Act by failing in the case of each of the plaintiffs to deliver within 30 days of its receipt of grain or beans from each of the plaintiffs a warehouse receipt or a price later agreement. Mich.Comp.Laws § 285.69, 69a.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1334. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(B), (N) and (O).

2. The nature of a party's property interest is a question to be determined initially by state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

3. Under Michigan law, one who sells one's product to another without retaining a security interest therein is no more than an unsecured creditor with a contract right to payment, and has no rights, other than to reclaim the property sold pursuant to Mich.Comp.Laws. § 440.2702; Mich.Stat. Ann. § 19.2702. This section is inapplicable to this case.

3. Besides which, the debtor is not a real party in interest in this case as it is a bankrupt corporation which has ceased business and has been fully liquidated. Its shareholders have no expectation of receiving a dividend in this case. Therefore, as noted frequently herein, the suit is truly "against" other similarly situated farmers. This is one practical reason why "[t]he trustee, in his capacity as trustee, is not estopped by the debtor's misconduct." *In re Earl Roggenbuck Farms, Inc.,* 51 B.R. 913, 917 (Bankr.E.D.Mich. 1985).

4. Under Michigan law generally, a person who stores his own goods (i.e., a bailor) with another retains an ownership interest therein. *Goldman v. Phantom Freight, Inc.*, 162 Mich.App. 472, 480, 413 N.W.2d 433 (1987).

5. Under Michigan law, one who stores goods with another may lose his ownership interest in the goods stored if the custodian also is a dealer in those goods. Mich. Comp.Laws § 440.2403(2).

6. The Michigan Grain Dealers Act, Mich.Comp.Laws § 285.61 *et. seq.* was designed to modify the foregoing scheme of property rights in a comprehensive way with respect to all transactions within its parameters. *In re Durand Milling Co.*, 9 B.R. 669, 672 (Bankr.E.D.Mich.1981).

7. The Grain Dealers Act establishes its own priority ladder for farmers competing for the inadequate inventory of a failed grain elevator. Mich.Comp.Laws § 285.68.

8. The intentions of the plaintiffs and the employees of the failed elevator at the time the possession of the grain is transferred from each plaintiff to the elevator is irrelevant under the Grain Dealers Act to the question of whether the farmer possesses a warehouse receipt.

9. Pursuant to the Grain Dealers Act, a farmer who is unable to produce an actual warehouse receipt is not a bailor and therefore has no ownership interest in the inventory stored in the elevator. Mich.Comp. Laws § 285.68.

10. 11 U.S.C. § 507(a)(5)(A) provides a superseding but mostly consistent priority for farmers who are mere unsecured creditors of the estate of a failed elevator but who have no ownership interest in any of the assets thereof.

11. The bond required by Mich.Comp. Laws § 285.67a(1) inures to the benefit of all parties who prove injury as a result of the debtor's violations of state laws relating to grain dealers, and not only to the benefit of warehouse receipt holders.

12. The bond is liable in each license year to benefit all parties who prove injuries suffered in the particular license year. *General Electric Credit Corp. v. Wolver-ine Insurance Co.*, 420 Mich. 176, 362 N.W.2d 595 (1984).

13. The appropriate date for the fixing of the amount of the plaintiffs' damages is the date the grain was actually sold since it was just a few days after the petition for relief was filed. *In re Durand Milling Co.*, 9 B.R. at 674.

14. Plaintiffs George McMullen and Mark Stout did not prove their damages as to soybeans as no evidence about the appropriate price per bushel was presented. Therefore, as to their soybean losses only, these plaintiffs do not recover against the bond.

15. The plaintiffs are entitled to prejudgment interest even if it requires payment in excess of the face amount of the bond. *General Electric Credit Corp. v. Wolverine Insurance Co., supra.*

## DISCUSSION

### I. PLAINTIFFS' STATUS UNDER THE GRAIN DEALERS ACT

The plaintiffs argued that they parted with possession only when they delivered their grain to the elevator and so they still hold title to it. They characterize the legal relationship created between themselves and the elevator as a bailment for storage purposes even though they never obtained a warehouse receipt to document it. The regulations adopted by the Department implementing the Act purport to define a bailment as "the delivery of farm produce by one party to a grain dealer to be held according to the purpose or object of the delivery and to be returned or delivered by the grain dealer when that purpose is accomplished." R285.560.1(1)(c). This definition, of course, is the everyday definition of a bailment. *See, e.g. Goldman v. Phantom Freight, Inc., supra.* The regulations go on to state: "Farm produce which is not received *as part of a bailment* or cash sale is a transaction for which a price later agreement is defined, and the grain dealer shall comply with the requirements relating to price later agreements in these transactions, regardless of the title of the document." R285.560.8(3) (Empha-

sis added).[4] The plaintiffs claim that since they delivered their grain to the elevator as a "bailment", the transaction was not a price later agreement.

The problem with this argument is that the term "bailment" no longer carries its common-law meaning in these types of transactions. The Department, in our opinion, created the confusion inherent in the plaintiffs' argument because its regulation defining a bailment was both unnecessary and incorrect. The Legislature has altered the common law definition of bailment for these purposes. The Act provides, in pertinent part: "Acceptance of farm produce for storage by a grain dealer *for which a warehouse receipt is issued* shall be a bailment and not a sale ...". Mich.Comp. Laws § 285.68 (Emphasis added). Thus, a farmer who delivers grain to an elevator is not a bailor until a warehouse receipt is issued. As we have found, no warehouse receipt was issued to any of these plaintiffs and so, by statutory definition, they did not create a bailment notwithstanding the overbroad definition of the term contained in the regulations.[5]

■ Even had the Legislature not altered the definition of a "bailment" for purposes of the Act, the plaintiffs would not necessarily have prevailed here. The mere fact that the plaintiffs intended to create a storage bailment with, and not to sell their grain to, the elevator does not *ipso facto* mean they obtain an elevated priority. A person may lose his title to property to a bona fide purchaser if he entrusts it with someone who deals in inventory of that type. Mich.Comp.Laws § 400.2403(2); *Executive Financial Services, Inc. v. Pagel*, 238 Kan. 809, 715 P.2d 381, 42 U.C.C.Rep.Serv. 1185, 59 A.L.R.4th 553 (1986). Here, of course, the plaintiffs entrusted their grain to an elevator that kept grain for others and for its own account. Thus, even if the plaintiffs are said to still maintain a bailment relationship, such fact may not advance their cause.

■ A mere bailor under the Act without a warehouse receipt simply lacks the elevated status of those with warehouse receipts. This is not much different from the status accorded consignors under the Uniform Commercial Code. If a person consigns his goods to a dealer in such property, he certainly has retained "title" to the goods. However, one who holds a security interest in the consignee's inventory, as well as a trustee in bankruptcy of the consignee (under 11 U.S.C. § 544(a)), prevails over the consignor in a contest over the goods, unless the consignor has perfected his title by filing a financing statement. Mich.Comp.Laws § 440.9114(2); *In re Denmark Co., Inc.*, 73 B.R. 325 (Bankr. S.D.Fla.1987); *In re Lebus–Albrecht Lumber Co.*, 38 B.R. 58 (Bankr.D.N.D.1984). In short, a bailor under this Act, just as a consignor under the Uniform Commercial Code, must "perfect" his title by obtaining the proper documentation—in this case, a warehouse receipt.

The Grain Dealers Act defines possible relationships between grain dealers and grain producers. Specifically, these relationships are in the nature of warehousing, grain banking, and price-later agreements. The Act establishes time limits and forms of documents to appropriately secure the desired relationship; however, it fails to set forth a default status to assign to parties who fail to obtain documentation establishing any of the enumerated relationships.

As indicated, the plaintiffs' main point is that they should be deemed to be bailors and therefore to be protected as if they held warehouse receipts. The plaintiffs called our attention to the grain dealers acts adopted in the States of Illinois, Iowa and Minnesota. The Illinois and Iowa statutes provide that if the parties fail to document any of the possible relationships the

---

4. Although the regulation seems ungrammatical ... "is a transaction for which a price later agreement *is defined*" ... [?], and vague ... "regardless of the *title of the document*" ... [what document?]—its substance is consistent with the statute. Mich.Comp.Laws § 285.69a.

5. Although "a long-standing interpretation of a statute by the agency which administers it is entitled to great weight [it] does not control when the interpretation is clearly wrong." *Murphy v. State of Michigan*, 418 Mich. 341, 348, 343 N.W.2d 177 (1984).

law *presumes* that a bailment was created. On the other hand, the Minnesota statute specifies that the grain is deemed to have been sold on open account absent some indication to the contrary. These statutes were presented for the proposition that the absence of a statutory default solution by the Michigan Legislature means that the issue may not be decided as a matter of law, but must be decided on a case-by-case basis. The plaintiffs asserted that the parties' intentions at the time of the transaction dictated the result: if the parties intended to create a bailment, even if the elevator failed to issue a warehouse receipt, the farmer should be deemed a bailor and should be paid ahead of other farmers. Evidence of this intent, they asserted, could be discerned from the parties' course of dealing. The conclusion that the issue is fact-specific, however, does not follow from the premise.

That the Legislature failed to direct the result in cases such as the instant case may have been for any of the following reasons: (1) it desired case-by-case "intentions of the parties" analysis; (2) it desired that the Department decide this question by promulgating rules or regulations or adopting a policy directive; (3) it desired that the courts decide this question as a matter of law in whichever way the courts deemed best; (4) it never even considered the issue. With no real legislative history available, we can discern no sound basis for choosing any of the above. Hence, by default, ironically, we are left to make the decision without any predisposition as to the appropriate alternative.

In *In re Biniecki Bros.*, 38 B.R. 519, 521–522 (Bankr.E.D.Mich.1984) the court described the function of the Grain Dealers Act. It stated:

The Grain Dealers Act, M.C.L.A. §§ 285.-61 *et. seq.*, imposes a prescribed set of form documents to evidence three basic alternative relationships between the farm producer and the grain dealer. At bottom, the farm producer may elect among the following alternatives:
(1) To sell grain to the grain dealer for cash upon delivery;

(2) To deposit grain with the grain dealer for storage; or
(3) To sell grain to the grain dealer for a posted price to be determined on a later date of the seller's choice.

When grain is delivered under any of these three alternatives, the grain is weighed upon the dealer's scale and described by crop, moisture content, grade, and weight. At that point, the dealer issues a "scale ticket" with the appropriate data. M.C.L.A. § 285.62(f) defines an "acknowledgment form" as "a written receipt issued by a grain dealer or his or her authorized representative to a farm produce owner which identifies the produce being transferred from the physical jurisdiction of the owner to the dealer. 'Scale ticket' is synonymous with acknowledgment form if used to describe weighed quantities of farm produce." If the grain is delivered for an immediate cash sale, the scale ticket will be priced and paid.

If the grain is not delivered for immediate sale, the farm producer has to elect either to store the grain with the dealer *qua* warehouseman or to sell it to the grain dealer for a price to be determined at a later date. Michigan farmers customarily refer to these sales as "price laters". The dealer is obligated to issue a statutorily prescribed form of grain receipt within thirty days of delivery, if the producer elects to retain title to the grain. This is the classic bailment. M.C.L.A. § 285.69(1).... A "warehouse receipt" is defined under M.C.L.A. § 285.62(i) as "a written acknowledgment issued by the grain dealer to a farm produce owner upon acceptance of the produce for storage in the dealer's facility."

.     .     .     .     .

M.C.L.A. § 285.69a(1) requires that "if farm produce which is received by a grain dealer is not received pursuant to a bailment or a cash sale, the grain dealer, not more than 30 days after receipt, shall provide the grower or owner of the farm produce with a price later agreement."

The documentary system breaks down, however, when the dealer fails to issue either the grain receipt or the price later agreement. All that the farm producer has is an "unsettled scale ticket." *There is no statutory presumption that one or the other alternative is deemed elected if a document to replace the scale ticket is not issued.* (Emphasis added).

In the instant case, the trustee previously filed a motion for summary judgment arguing that the parties' intentions here were not to create bailments and, therefore, the plaintiffs retained no ownership rights in the grain. The plaintiffs argued that their intention was to create a bailment, and so they retained an ownership interest in the grain they delivered and therefore should be equitably treated in the same class as the warehouse receipt holders. In the final pretrial statement, all of the parties identified as an issue for trial "Whether or not the parties intended a bailment, and whether or not bailments existed between the Plaintiffs and Mayville." They each cited *Biniecki* as authority for the crucial proposition that the intention of the parties controls. Since intention was apparently a material question of fact in dispute, we were compelled to try the case. Obviously, in light of our previous holding, the plaintiffs' argument has little force. Nonetheless, their principal argument was along this line and it therefore ought to be addressed.

The plaintiffs argued that *Biniecki* was incorrectly decided and that *Durand Milling* set the proper standard. *Durand Milling* concluded that farmers who held only unsettled weight slips enjoyed a status as bailors. *Biniecki* denied such status. *Durand Milling* was a lawsuit primarily against the individual officer of the bankrupt elevator responsible for the conversion and not truly against the bankruptcy estate. Leapfrogging over the liquidation rights of other similarly situated farmers was not in issue. Therefore, the officer's and other agents' acts on behalf of the bankrupt (this was a Bankruptcy Act case), were the proper focus of the court's attention. This meant that the fact that the officer and the corporation had violated the statutory provisions regarding the operation of a grain elevator was relevant. The court determined that a bailment relationship had been created and that the officer and the bankrupt corporation had committed a willful and malicious conversion of the plaintiffs' property. Accordingly, they were each found liable and the debts were found to be non-dischargeable.

Two major points of distinction separate *Durand Milling* from the present case. First, as noted, the parties in *Durand Milling* were the bankrupt elevator and its responsible officer and two farmers holding weight slips for grain they deposited at the elevator. Here, of course, we are dealing, in essence, with two groups of farmers without warehouse receipts, one of which seeks to have a liquidation preference over the other. What the plaintiffs here continuously misapprehend is that the omissions or misdeeds of the elevator's employees are not the issue since this conflict does not involve the debtor (a corporate entity which no longer exists), or its shareholders (since there is no conceivable way they will obtain a dividend); instead, this case is a dispute between two equally innocent classes of creditors.

There is also a factual distinction between *Durand Milling* and the instant case. In *Durand Milling*, the plaintiffs received weight slips which contained the statement "All Grain Considered STORED Unless Other Arrangements Have Been Made." Here, the weight slips are clearly marked with the words "NOT A STORAGE WAREHOUSE RECEIPT".

■■■ We believe that as to the issue which divided *Biniecki* and *Durand Milling* —is there an express statutory presumption in favor of bailment—*Biniecki* is correct. When a legislature wants to establish a statutory presumption it uses words which can be honestly read to do so. *See e.g.* Minn.Stat. § 232.17. As noted above, the Michigan Grain Dealers Act lacks any such express direction. However, on the question of whether the statutory scheme allows a determination as a matter of law or requires an inquiry years

later into the intentions of the parties at the time of the transactions in question, we disagree with *Biniecki's* conclusion and favor the former.

*Biniecki* asked "what did the parties intend?". 38 B.R. at 525. However, in that case, the answer was obvious since the elevator dealt only in price later agreements. The parties could not have intended anything other than price later agreements and, of course, the court so held and the farmers lost. Indeed, it was the trustee in that case who asked the court to examine the parties' intentions. The farmers who tried to improve their position failed because the court found their intent was simply to be treated as unsecured creditors. The real question is what would the court in *Biniecki* have done if it found as a fact that the parties intended a bailment relationship instead of a sales relationship? Then, of course, the statement about the parties' intention would have been crucial. We believe that the statement in *Biniecki* concerning the parties' intention was unnecessary and leads one off the course.

The intent of the parties is not relevant, we hold, since the question must be decided pursuant to a coherent state statutory regulatory scheme which entirely occupies this field. *Durand Milling*, 9 B.R. at 672. Where a legislature establishes a sophisticated statutory scheme creating qualitative ownership and payment rights, such scheme must be strictly followed to retain the rights so created. *See e.g. J & I Service Station, Inc. v. Wash Wagon of Michigan, Inc.*, 120 Mich.App. 533, 327 N.W. 2d 518 (1982); *Renshaw v. Samuels*, 117 Mich.App. 649, 324 N.W.2d 117 (1982); *but cf., Norcross Co. v. Turner–Fisher Associates*, 165 Mich.App. 170, 418 N.W.2d 418 (1987). The Grain Dealers Act sets up such a scheme with form documents designed to provide certainty as to the ownership interest in all grain stored by grain dealers.

From the start, the plaintiffs assumed that the Grain Dealers Act was meant to protect the interest of farm producers exclusively. A review of what is admittedly a sparse legislative history demonstrates that it is likely that the statute was designed to protect the grain dealing industry as well as the grain producing industry. *See also Biniecki*. If the plaintiffs are successful, other farmers in this bankruptcy estate will be unpaid. To the extent the Grain Dealers Act was meant to benefit farmers, we believe it was meant to benefit both the plaintiffs and the non-party farmers equally, and so the plaintiffs can gain no benefit therefrom.

■ Because we are deciding a question of property rights, the substantive law of the state controls in the absence of a strong federal interest which supersedes. *Butner v. United States, supra.* Thus, we are required to decide this question as a state circuit judge would in a dispute between these plaintiffs and the Department, the state's statutory trustee for these purposes. The Department has, by administrative policy, adopted the position which exists in Minnesota by virtue of statute. In this regard, we find persuasive the argument by the Department that in the absence of a legislative mandate, the Department need not, prior to distributing the assets of a failed elevator, consider the testimony of each farmer and grain dealer in every grain dealer insolvency case to determine their intentions as evidenced by their course of dealings. Such a burdensome requirement would drastically reduce the efficiency of the processes established by the Department pursuant to the Grain Dealers Act and thus be contrary to the statutory purposes. Moreover, the Department cogently argues that if a case-by-case approach were utilized, farmers would often be better off not electing to take a warehouse receipt or a price later agreement so that they may view the direction of the market without risk. If prices go up or if the elevator goes bust, they could call the deals bailments and request warehouse receipts. In case of a glut on the market with grain prices heading down, farmers would describe the transactions as price later agreements and force the elevator to buy the grain even against its will. Such incentives would severely damage the stat-

utory scheme.[6] The views of the Department as an expert in this field, are entitled to great weight. In construing a statute, the court is directed to respectfully consider the construction given by those charged with its application. *Latham v. Wedeking,* 162 Mich.App. 9, 12, 412 N.W.2d 225 (1987); *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Here, pursuant to Mich.Comp.Laws § 285.63(6), the Legislature delegated to the Department of Agriculture the interpretation and implementation of the Grain Dealers Act. To the extent that the Department has concluded that these plaintiffs are not to be treated as warehouse receipt holders, we concur.

## II.  APPLICABILITY OF STATUTORY BOND

■ The plaintiffs also sued the Department of Agriculture and Michigan Millers Mutual Insurance Company. They allege that the bond issued by Michigan Millers in conjunction with the debtor's license application, which runs to the Department, inures to their benefit. Both Michigan Millers and the Department interpret the Act, particularly Mich.Comp.Laws § 285.67a, as making the bond liable when available funds prove inadequate to fully pay only warehouse receipt holders. In the instant case, the Department did not pursue payment of the bond as the estate was able to pay all warehouse receipt holders in full. The Department correctly decided that these plaintiffs are not warehouse receipt holders; however, it was incorrect not to pursue payment on the bond. The plaintiffs sue in the name and stead of the State in the role of intended beneficiaries. Mich. Comp.Laws § 600.1405; Mich.Stat.Ann. § 27A.1405; *Riemersma v. Riemersma,* 29 Mich.App. 485, 487, 185 N.W.2d 556 (1971).

The Department and Michigan Millers argue that the Act requires Michigan Millers' bond to protect only warehouse receipt holders. Mich.Comp.Laws § 285.67a(1) provides as follows:

> An application for a grain dealer's license shall be made on a form provided by the director, shall be filed 30 days in advance of a license expiration date if there is an outstanding license, and shall be accompanied by a sufficient bond on a form provided by the director. The bond shall run to the department of agriculture with sufficient surety conditioned for the faithful performance of *the duties of a grain dealer* and compliance with *all* laws of this state relating to grain dealers. The amount of the bond for a grain dealer who is a bailee of farm produce or who issues warehouse receipts shall be $15,000.00 for the first 10,000 bushels of storage capacity of the grain dealer, plus $5,000.00 for each additional 10,000 bushel capacity or fraction of that capacity used for the storage of warehouse receipted farm produce. . . . (Emphasis added).

We do not read the language of the Act to restrict bond coverage solely to protect warehouse receipt holders. While the requirement for procuring this particular bond is restricted to grain dealers that warehouse grain, its benefits are not so restricted. It may be argued that the Legislature restricted bond coverage only to those farmers who possess warehouse receipts in an earlier version of this Act. Earlier, the Act stated that "[t]he bond shall run to the department of agriculture with sufficient surety conditioned for the faithful performance of *the duties of a warehouseman* and compliance with all laws related thereto." *See* 1963 Mich.Pub. Acts 180, p. 267; 1962 Mich.Pub.Acts 159, p. 161. (Emphasis added). The Department may then have been correct to limit bond coverage to benefit warehouse receipt holders only. However, the change in the pertinent language of this Act rendered by 1976 Mich.Pub.Act. 259, p. 979, bringing the section to its present form, demands an enlargement of the scope of bond coverage.

---

**6.** Of course, the Act gives a farmer 30 days' opportunity for speculation, as the farmer has that long to advise the elevator which document to issue. However, when that period has expired, the elevator is obligated to issue a warehouse receipt if the farmer has not affirmatively elected otherwise.

Where the Legislature establishes a statutory bond requirement conditioned for the faithful performance of all laws related to *grain dealers*, which, of course, includes functions much broader than mere warehousing, it has not limited coverage to only warehouse receipt holders. Moreover, the new statute requires a dealer to comply with ALL laws pertaining to grain dealers, which includes laws which relate to farmers with price later agreements, etc. To the extent that the Department unilaterally continues to limit bond coverage, it is incorrect.

The Department and Michigan Millers argue that sound policy dictates against allowing the bond to benefit holders of price later agreements and others with distribution priority lower than warehouse receipt holders. Such more generous bond coverage, they argue, would benefit procurers of price later agreements when they deal with grain dealers which happen to warehouse grain. Other PLA producers would not be so protected. This "unequal protection", they assert, justifies their conclusion that only warehouse receipt holders should benefit from the bond.

This policy position is not well reasoned. Instead, policy reasons support applying the bond for the benefit of others than warehouse receipt holders. For example, producers who procure price later agreements from a grain dealer which deals in warehouse receipts must enjoy a status lower than any warehousing producers in the event of a grain dealer insolvency. As the assets of the grain dealer necessarily go first to warehouse receipt holders, a producer with a PLA is at a disadvantage when he deals with a warehousing grain dealer. This is the opposite side to the defendants' argument. The bond is necessary to protect non-warehousing producers who deal with grain dealers which warehouse grain as such producers suffer a greater risk of loss. The bond helps to equalize protection.

■ Regardless, the plain language of the statute controls. Where a statutory bond is required, the language of the law is read into the bond to supply missing clauses. Language inconsistent with the statute is redacted from the bond and is non-binding.

A statutory bond is one commanded or provided by statute. In such a bond, the existing law becomes a part of the bond, omitted conditions required by law are read into the bond and conditions contrary to the law are read out of it. The doctrine of "what is omitted will be read in and what is in conflict will be read out" applies only to bonds required by statute.

*Commissioner of Insurance v. Central West Casualty Co.*, 301 Mich. 427, 432, 3 N.W.2d 830 (1942). The title of the bond in issue is "Grain Dealers Bond for Warehouse Receipted Farm Produce." As this title implies that the bond benefits only warehouse receipt holders, it is contrary to law and therefore to be read out of the bond. Any discussion of the warehousing of grain in Mich.Comp.Laws § 285.67a(1) is meant to establish the amount of the bond only; such language does not restrict bond coverage.

■ The Act requires that the grain dealer provide documentation within 30 days after delivery. Mich.Comp.Laws § 285.69, 285.69a. Mayville Feed & Grain, Inc. failed to do so. In the absence of a request for some other document, a grain dealer must forward a warehouse receipt within 30 days. *In re Walkington*, 62 B.R. 989, 992 (Bankr.W.D.Mich.1986). The debtor's breach of this obligation led to this lawsuit, placed these plaintiffs into a class with a lower priority than that of properly documented warehouse receipt holders, and triggered the liability of the bond. Because of the debtor's violation of law, the bond is liable.

■ Michigan Millers argues that even if the bond is for the protection of these plaintiffs, its maximum liability is limited to $20,000 without regard to when any noncompliance with applicable laws occurred. *General Electric Credit Corp. v. Wolverine Insurance Co., supra*[7] is per-

---

**7.** Inexplicably, neither this important case nor

*Commissioner of Insurance v. Central West Cas-*

suasive authority on this issue and it is to the contrary. *Wolverine Insurance* held that the bond required by dealers of motor vehicles, Mich.Comp.Laws § 257.248(7); Mich.Stat.Ann. § 9.1948(7), was annually applicable to its maximum face value. Aggregated liability or, as the plaintiffs have phrased it, "stacking", was appropriate where triggering events occurred in December of one coverage year and January of the next coverage year.

To reach this conclusion, the *Wolverine Insurance* court considered several arguments. First it looked to the specific statute at issue which stated "that the renewal bond shall be 'in the same amount and with the same effect as an *original* bond' " 420 Mich. at 191, 362 N.W.2d 595. (Emphasis in original). To the court this language meant that the second bond was to have the same effect for the following year; additional coverage was provided to the extent of the maximum of the bond to cover specified judgments which concerned events which occurred during that subsequent year.

The statute at issue here is not quite as explicit as that which was involved in *Wolverine Insurance*. However, the logic behind aggregated liability remains just as clear. Requiring licensees to annually purchase their grain dealer's bond from a new issuer seems the only way to retain maximum coverage were we to accept Michigan Millers' position. A grain dealer staying with the same insurer would be securing a bond of a value proportionately related to its years dealing with the insurer. "The legislature sought, by the statute here in question, to protect third parties, not to penalize [grain dealers] by requiring the purchase of near valueless bonds." *Wolverine Insurance*, 420 Mich. at 176, 362 N.W.2d 595. Only by requiring burdensome bond shopping would the public be protected to the extent contemplated by the statute. Otherwise, the public is only protected to the extent of the bond divided by some risk factor related to the duration of the grain dealer's dealings with the bond issuer. Indeed, it would make more sense,

then, for farmer-producers to deal annually with a newly-formed grain dealer, as they would be protected to the full extent of the bond during that first year. Of course, such conduct is ridiculous and is not contemplated by the statute.

While it is true that the Grain Dealers Act is not as clear as the act in *Wolverine Insurance* as to this issue, the language of the bond itself provides the elements missing from the statute. Since this language is not inconsistent with the statute, it will not be read out and, thus, is binding. In pertinent part, the grain dealer's bond provides as follows: "The liability of the surety for any one or more claims *in any license year* shall not exceed in the aggregate the sum of this bond." (Emphasis added). This plain language within the body of the bond demonstrates that the bond is applicable to its maximum to cover events during each license year. Any other interpretation makes the emphasized language superfluous. "Interpreting a surety bond to be continuous, in the way [Michigan Millers] would have us do in this case would be to hold that the insured was paying an additional premium while receiving no additional protection." *Wolverine Insurance*, 420 Mich. at 194, 362 N.W.2d 595. In this case the public would be receiving no additional protection. We refuse to burden a grain dealer with premiums which afford the public no protection and, so, we hold that each year's bond is liable to its annual maximum to cover those losses accrued within each individual license year.

## III. PRE–JUDGMENT INTEREST

■ Upon the authority of *Wolverine Insurance*, 420 Mich. at 195, 362 N.W.2d 595, the plaintiffs are entitled to pre-judgment interest at the federal rate from the date of the filing of this lawsuit to the date of judgment. Liability for this pre-judgment interest is not limited by the face value maximum of the bonds issued by Michigan Millers. "[P]rejudgment interest is properly awarded even if the insurer's total liability then exceeds the policy's stat-

*ualty Co.,* 301 Mich. 427, 3 N.W.2d 830 (1942)

were cited by any of the parties.

ed limits." *Wolverine Insurance*, 420 Mich. at 195, 362 N.W.2d 595.[8]

## IV. DAMAGES

Reduced to dollar amounts, the plaintiffs' claims against the estate are as follows: (a) Duane LaBair, $14,761.86; (b) Mitchell LaBair, $4,260.00; (c) George McMullen, $4,888.68; (d) Edmond and Edward Stevens, $19,820.37; (e) Gerald Stout, $5,735.30; (f) Keith Tedford, $10,005.59; (g) Daniel Day, $35,460.05; (h) Mark Stout, $9,915.72; (i) Wildrex Thornton, $18,105.00; and (j) Bernard Cobb, $4,441.05. George McMullen's and Mark Stout's claims related to soybeans cannot be reduced to a dollar amount. Although the plaintiffs' counsel in closing arguments asserted a price of $5.00 per bushel for soybeans, no evidence was presented at trial to support this assertion. The failure to prove the element of damages means that judgment must enter against these plaintiffs as to their soybean-related losses. This does not mean that the trustee may not include these soybean-related claims when distributing the remainder of the estate. Presumably, these plaintiffs filed proofs of claim asserting damages relating to their soybeans. To our knowledge, no objection has been filed to such claims. Thus, the issue is not now before the Court. On the other hand, if a proof of claim was not filed by these plaintiffs, they may indeed be without a claim as to the soybeans. We need not decide this question now. What our decision does mean is that these plaintiffs may not recover money from defendant Michigan Millers based on any soybean-related losses.

After the trustee distributes the remainder of the funds in the estate, these plaintiffs shall be entitled to a recovery against the bonds for any deficiencies. There are two relevant license years for which the bonds' liability is triggered. One is from March 21, 1984 through March 20, 1985 and benefits only plaintiff Daniel Day to a maximum of $20,000 plus pre-judgment in-

terest, as he is the only party who delivered grain to the debtor during that license year and thus is the only party who proved any losses suffered during the time period. Day delivered $15,002.76 worth of corn in the 1984 license year.

The other relevant license year is from March 21, 1985 through March 20, 1986. Again, the bond is liable to a maximum of $20,000 plus pre-judgment interest. All of the plaintiffs, including Day, delivered grain to the elevator during this time period and were not presented adequate documentation within 30 days and, so, are eligible to recover against this bond. Should the $20,000 prove inadequate to satisfy all the plaintiffs in full, then it shall be distributed *pro-rata*. If the distribution must be *pro-rata*, then pre-judgment interest on the full $20,000 must be distributed *pro-rata* as well.

Until such time as the trustee has completed his disbursement, the amount of Michigan Millers' liability cannot be determined. Therefore, a judgment will enter after disbursement to the plaintiffs and others similarly situated has been completed.

---

8. Only the plaintiffs may share in this judgment as only they sued. The Department of Agriculture (and perhaps the trustee) could have, but did not sue on behalf of the class of unpaid farmers. There is no authority of which we are aware which allows recovery to persons who did not join in a successful lawsuit with others similarly situated who did.